J. R. Swan, J.
I. Was the loan of $8,000, in respect to the question of usury, to be governed by the laws of New York or .of Ohio ?
The contract for the loan was made in the State of New York; ■the money was advanced there; the note and mortgage delivered there; and the loan was to be repaid there. The fact that one of the incidents of the debt consisted of a lien, by way of mortgage, upon lands in Ohio, to secure payment, does not change the law in this respect. It was a contract not only made, but to be performed in the State of New York, and must be governed by the laws of that state.
II. Was the loan usurious?
Four hundred dollars, being five per cent, on the loan, was paid *to Mitchell. What was the consideration of this? The written contract of March -17, 1836, given above, states substantially that it was in consideration that Mitchell would advance and loan to the Lockwoods eight thousand dollars at a future day. On the face of the contract, and by its terms, the four hundred dollars was an open and undisguised gratuity for the loan of money over .and above the seven per cent, interest on the loan. Mitchell in his .answer denies this, and assigns the usual reasons which lenders give for withholding a loan from an unfortunate borrower; bank bills in Westchester county were not worth as much as money in the city of New York ; the difference, together with the trouble of ■converting bank bills current in Westchester into funds current in .New York, was at least one per cent.; that the Lockwoods would *367 make a considerable profit on the loan when they received it, by the difference in exchange between New York and Ohio; that George Lockwood assured Mitchell that, by the laws of Ohio, he might take what he pleased for the loan and recover. Such reasons as these, especially the last, for taking the bonus of four hundred dollars, only confirm in our minds the belief that the terms of the contract truly state the consideration of the four hundred dollars, and throw so much suspicion over the only plausible reason given in the answer, to wit, a compensation for looking to and changing securities, that we have had no hesitation in coming to the conclusion that the transaction is tainted with usury. It would require a clear, distinct and sufficient consideration for the payment of the four hundred dollars to be alleged and proved, to overcome the usurious consideration stated in the written contract. Instead of this, parts of the consideration alleged are no consideration at all. No means of determining the value of the others are alleged. The trouble and vexation of taking the note and mortgage, or drawing his check for the eight thousand dollars, might as well have formed a part of the consideration as some of those stated by Mitchell.
III. As to the effect of the loan being usurious.
The complainant has so shaped his bill and prayer for relief that, while he claims that the contract was tainted with usury, he does *not set up the statute of New York for the purpose of avoiding the payment of the loan, but simply claims that the excess of interest was paid without consideration, and prays that such excess may be applied as payment on the interest.
We perceive no objection to a party thus consenting to the equity and at the same time requiring a credit for the excessive interest. No objection to this is made or can be made by the defendants.
IY. The real difficulty in. this case is to determine the effect upon the rights of George Lockwood, of the family contract, decree and sale to James C. Lockwood, under the mortgage, and the conveyance by him to Mitchell.
At the time that contract was entered into, Mitchell was enjoined from further prosecuting his claim on the ground that it was usurious. Sis hands seemed to be tied and with a fair prospect of losing both principal and interest. In this condition of things, he procured a meeting of the friends of George Lockwood, who was then in the asylum, and they entered into the family contract.
*368 Two objects seem to have been in view. Mitchell desired to avoid the question of usury and to get rid of the pending injunction. James C. Lockwood desired to obtain such a control of his father’s property as that it might be sold to pay debts. Proceedings under the mortgage were therefore provided for by James C. Lockwood, not for the purpose, by sale under a decree, to pay the mortgage ■debt, but to vest the legal title of the mortgaged premises in him. And these proceedings under the mortgage were consented to by Mitchell, not for the purpose of asserting his lien upon the mortgaged premises, and by decree creating a fund for the payment of the debt, for he was not to be paid by a sale under the decree, nor was he to enforce his lien by an order of sale; his object was to have his debt recognized and get rid of the chancery suit in New York. To attain these results it was agreed that the chancery and ejectment suits should be discontinued ; that the amount of the loan and interest be restated; that James C. Lockwood should prosecute to foreclosure the mortgage made by George and Ralph Lockwood to Mitchell *and Crawford; that James C. Lockwood should bid off the premises, but should pay nothing as purchaser; that Mitchell and Crawford, however, should follow a part of the land into the hands of James C. Lockwood, to secure the mortgage debt, the latter holding the premises as trustee for Mitchell and Crawford, and selling and accounting for proceeds of sales and of rents, to pay the mortgage debt.
This was a very ingenious mode, on the part of Mitchell, of defeating the claim of usury set up by George Lockwood, the lunatic; and a very ingenious mode, on the part of James C. Lockwood, to divest his father of the legal title to his real estate.
In the first place, let us ascertain what effect the family contract had upon the decree.
A decree of foreclosure ordinarily bars the right of the mortgagor to redeem by payment of the mortgage debt; a sale is made under the decree to satisfy the mortgage debt; the purchaser at such sale takes the title, unincumbered by the mortgage debt, and cleared off all claim of the parties to the mortgage. But in the case before us, even if we treat the family contract as obligatory upon George Lockwood, the decree of foreclosure did not operate to bar the equity of redemption; for it is clear, that the moment James O. Lockwood purchased and obtained title under the decree as trustee, to pay the mortgage debt, George Lockwood might, notwithstand *369 ing the decree, have then tendered to James C. Lockwood, the-trustee, and Mitchell and Crawford, the amount of the mortgage-debt, and enforced a reconveyance of the premises.
Nor was the sale to James C. Lockwood, under the decree, made-for the purpose of satisfying the mortgage debt; for James C. Lockwood was not to pay anything on his bid, nor was his bid to-be credited upon the decree. Nor was the purchaser to take the-title unincumbered by the mortgage debt, or cleared of the claims-of the parties to the mortgage. The debt was to stand and follow the premises, notwithstanding the sale. This decree, therefore, as-a decree of foreclosure, was made inoperative, as such, by the terms-of the family contract. That such a contract, if entered into by the parties to a decree, or their authorized *agents, would be valid, and that a court of chancery would enforce it, and make the operation of the decree subordinate to the stipulations of the parties, we entertain no doubt.
The prosecution of the suit on the mortgage, the amount of the decree, the decree itself, the sale thereunder, and the rights- and estate acquired thereby, were inseparable parts of, and subordinate to, the stipulations of the family contract.
George Lockwood was not a party to this family contract, and no one was authorized to act for him. The family contract being-unauthorized and void as to him, and the decree having been procured in consideration of the stipulations of the contract, and, indeed, forming apart of it, what shall be the operation and effect of the decree? Not, certainly, as a har to George Lockwood’s-right to redeem, for that would be giving it, as we have seen, a more stringent effect than if the family contract had been authorized by him, and an effect, too, which Mitchell and Crawford did not contemplate. Nor is it necessary, in order to protect the rights-of George Lockwood, that the decree, or the sale thereunder, should be impeached for fraud or error, or that the legal title acquired under the decree, by James C. Lockwood or Mitchell, should be pronounced invalid. But we can not, under the facts, do less than-hold James C. Lockwood and Mitchell to be trustees of the estate-of George Lockwood, liable to account to him for sales-, and the premises unsold, and George Lockwood liable to account to Mitchell and Crawford for the real amount of the mortgage debt. By thus-holding, we recognize the decree as valid and operative as to third persons, protect the just rights of Mitchell and Crawford *370 under their mortgage, and treat the decree as so inseparably connected with the stipulations of the family contract as not, in its operation and effect, to conclude the rights of George Lockwood as against the parties to that contract.
Y. As to the disposition of the usurious interest.
One of the objects which this family contract was intended to effect, and did effect, was the dismissal of the suit in New York, brought to impeach the mortgage debt for usury. The family contract being unauthorized and void as to George Lockwood, the'dismissal of that suit being also unauthorized and to the prejudice *of the rights of the insane mortgagor — there being in fact usury in the transaction — the trustees of the lunatic being now required to account to Mitchell and Crawford for the principal and interest, are entitled to at least credit the excess of interest beyond the lawful rate, as claimed in the bill.
YI. As to the relation of the representatives of Ralph Lockwood to the surviving partner, and to the decree in his favor.
George Lockwood, as surviving partner of the firm of George and Ralph Lockwood, was vested with the entire estate and control of the property of the firm. The representatives of Ralph Lockwood had no such distinct interest or authority, in settling the debts of the partnership or disposing of its estate, as would authorize us to enforce their agreement, to the prejudice of the authority •or the rights of George Lockwood, as surviving partner. We can not separate the unauthorized contract of the representatives of Ralph Lockwood, in relation to the debts and estate of the firm, and enforce them against such representatives, and at the same time vindicate the rights and authority of George Lockwood, as .surviving partner. The rights of the representatives of Ralph Lockwood must therefore be controlled by, and follow the rights •of Geoi’ge Lockwood. Thex*e may be eases in which the rights of .a surviving partner, and of the represexitatives of a deceased partner, may be concluded by the contracts of the latter ; but this is not such a case. Here the representatives, as such, were dealing with a contract and an estate over which they had no control, and in such a manner as directly to impair the rights and affect the authority of the surviving partner.
This case will be referred to a master, to state an account in accordance with the views above indicated.
Bartley, C. J., and Brinkerhoee, Scott, and Sutliee, JJ., concurred.